```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
UNITED STATES OF AMERICA,                                         :
                                                                  :
                      -v-                                         :         S1 19 Cr. 125 (VSB)
                                                                  :
CHAZ JONES,                                                       :         OPINION & ORDER
                                                                  :
                              Defendant.                          :
                                                                  :
------------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4/22/2020

VERNON S. BRODERICK, United States District Judge:

  Before me is the motion of Defendant Chaz Jones ("Defendant" or "Jones") for "temporary release to home detention pending his sentence date and surrender on June 12, 2020, pursuant to 18 U.S.C. § 3143," based upon his having had Burkitt Lymphoma as a teenager and the treatment he received for that disease. (Doc. 58, at 1.) Because I do not find by clear and convincing evidence that Jones is not likely to flee or pose a danger to any other person or the community, and that Defendant has not demonstrated that "there are exceptional reasons why [his] detention would not be appropriate," 18 U.S.C. § 3145(c), his motion for temporary release is DENIED.

### I.  Background and Procedural History

  According to sealed superseding indictment S1 19 Cr. 125 ("Superseding Indictment"), Jones was a member of a gang operating in the George Washington Carver Houses in New York, New York (the "Carver Houses Crew"). (Sup. Ind. ¶ 1.)[1] From at least 2014 until

---

[1] "Sup. Ind." refers to the Sealed Superseding Indictment returned by a grand jury and filed on May 8, 2020, and unsealed on May 10, 2020. (Doc. 12.)

approximately May 2019, the members of the Carver Houses Crew engaged "in, among other things, murder, attempted murder, assault with a dangerous weapon, and narcotics trafficking." (*Id.*)

An arrest warrant for Jones was filed on February 25, 2020, (Doc. 4), and he was arrested pursuant to a writ on February 28, 2020, (Doc. 6). At his initial appearance, Jones consented to detention without prejudice to seeking bail at a future date, and waived the preparation of a presentence report. (*Id.*) Prior to pleading guilty, Jones never sought a bail hearing. Jones is currently housed at the Metropolitan Detention Center ("MDC"). (Doc. 58, at 1.)

On November 25, 2019, Jones pled guilty to a superseding information charging him with possessing a firearm during and in relation to, and in furtherance of, a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i). Specifically, Jones admitted that "[f]rom 2014 to 2019 in New York County during [his] participation in an agreement or conspiracy to sell crack cocaine, [he] possessed an unlicensed firearm to protect [his] drugs and [himself]," and he knew "it was illegal to possess cocaine, to sell cocaine, and to possess an unlicensed firearm." (Doc. 45, at 19:6-10.)

On March 25, 2020, Defendant filed a letter motion with exhibits seeking his "temporary release to home detention pending his sentence date and surrender on June 12, 2020, pursuant to 18 U.S.C. § 3143." (Doc. 58, at 1.) The Government filed its opposition on March 26, 2020, (Doc. 59), and Jones filed his reply with exhibits on March 30, 2020, (Doc. 60). On April 16, 2020, Jones filed a supplemental letter. (Doc. 62.)

**II.     Applicable Law**

Where a defendant has been convicted of a crime for which the maximum sentence is life imprisonment, detention pending the imposition of the sentence is mandatory. *See* 18 U.S.C. §§

3143(a)(2), 3142(f)(1)(B).  Section 3143(a)(2) requires mandatory detention pending sentencing, unless (1) "the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or" (2) "an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and" (3) "the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community."  18 U.S.C. § 3143(a)(2).

Section 3145(c) provides that "[a defendant] subject to detention pursuant to section 3143(a)(2) . . . and who meets the conditions of release set forth in section 3143(a)(1) . . . may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate."  18 U.S.C. § 3145(c).  Section 3143(a)(1) provides that a "judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence . . . be detained, unless [a] judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c)," and if a "judicial officer makes such a finding, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c)."  18 U.S.C. § 3143(a)(1).

"[E]xceptional reasons" warranting the release of a defendant subject to mandatory detention are those that "present a unique combination of circumstances giving rise to situations that are out of the ordinary."  *United States v. DiSomma*, 951 F.2d 494, 497 (2d Cir. 1991).  This can include "an unusual legal or factual question," or "merely [a] substantial question may be sufficient, in the presence of one or more remarkable and uncommon factors, to support a finding of exceptional reasons for the inappropriateness of detention."  *Id*.  In making such

3

determinations, "a case by case evaluation is essential," and a district court's discretion "is constrained only by the language of the statute: 'exceptional reasons.'" *Id.*; *see United States v. Hugo Witter*, No. 19 Cr. 568 (SHS), Dkt. 40 at 2 (S.D.N.Y. Mar. 26, 2020) ("*Witter*"); *see also United States v. Lea*, 360 F.3d 401, 403 (2d Cir. 2004) ("The test under § 3145(c) is necessarily a flexible one, and district courts have wide latitude to determine whether a particular set of circumstances qualifies as 'exceptional.'"). With this legal framework as guidance, some courts have found that "exceptional reasons" exist where a defendant has a documented health condition that places that inmate at heightened risk of serious complications from exposure to COVID-19, justifying release under § 3145(c). *See*, *e.g.*, *United States v. Lopez*, 19-CR-116 (KMW) (JLC), 2020 WL 1678806, at *2-3 (S.D.N.Y. Apr. 6, 2020) (granting temporary release on bond pursuant to § 3145(c) where defendant's asthma made him more susceptible than others to potentially getting very sick, or dying, from COVID-19."); *United States v. McDuffie*, No. 19-CR-212 (VEC), 2020 WL 1659879, at *1 (S.D.N.Y. Apr. 3, 2020) (granting temporary release on bond pursuant to § 3145(c) where defendant's rheumatoid arthritis made him "particularly susceptible to COVID-19, a highly infectious and potentially fatal illness that has been found in the facility in which he [was] being detained."); *United States v. McKenzie*, No. 18-CR-834, 2020 WL 1503669, at *3 (S.D.N.Y. Mar. 30, 2020) (granting bail where "the heightened threat posed by COVID-19 to an inmate with a documented respiratory condition in a detention facility with multiple confirmed cases present[ed] a unique combination of circumstances." (citation omitted)); *Witter*, No. 19 Cr. 568 (SHS), Dkt. 40 at 2-3 (granting bond pending sentencing, pursuant to § 3145(c), to defendant, who had pleaded guilty to a narcotics offense, because defendant was at heightened risk because of his hypertension which was being treated with several medications).

### III.    Application

Defendant argues that he should be temporary released pursuant to 18 U.S.C. § 3145(c) because as a teenager he was diagnosed with and successfully treated for Burkitt Lymphoma which he asserts likely caused "lasting deleterious effects on his immune system, making him more vulnerable than most to the escalating coronavirus pandemic."[2] (Doc. 58, at 1.)  In opposition the Government argues that "the defendant cannot demonstrate the circumstances necessary to justify his release based upon his assertions regarding the current COVID-19 pandemic." (Doc. 59, at 1.)  Specifically, the Government asserts that (1) "defendant's arguments in favor of release due to COVID-19 rely on a number of asserted eventualities regarding Jones' likelihood of contracting COVID-19, and the MDC's purported failure to contain COVID-19, all of which are speculative," (Doc. 59, at 2-4); (2) the case law warrants detention, (*id*. at 4-5); (3) Defendant's health condition does not warrant his temporary release, (*id*. at 5); (4) Defendant is a danger to the community, (*id*. at 5-6); and (5) Pretrial Services ability to supervise Defendant may be diminished due to the COVID-19 pandemic, (*id*. at 6).

---

[2] As support for this assertion, Defendant states in a footnote that "[a]ccording to the Mayo Clinic childhood cancer survivors treated with chemotherapy and other therapies are at higher risk for a host [of] late effects including but not limited to reduced lung capacity. https://www.mayoclinic.org/diseases-conditions/cancer/in-depth/cancer-survivor/art-20045524." (Doc. 58, at 1 n.1.)  Later in his submission, Defendant states "[t]he American Cancer Society website related to Childhood Leukemia indicates that 'certain chemotherapy drugs or radition (sic) therapy to chest can sometimes cause hear or lung problems later in life . . . '  The Leukemia and Lymphoma Society suggests that depending on treatment and overall healthy survivors may suffer long term and late effects of chemotherapy including impairment of the immune function.  Another study in the Journal of Oncology available online suggests the same noting that 'children who have completed leukemia therapy may remain at a higher risk [for] infections, as prior laboratory studies have shown persistent immune dysfunction for months to years after leukemia and chemotherapy.'"  (*Id*. at 6 (citations omitted).)  Other than these statements and the related citations, Defendant does not provide evidence or even assert that he suffers from any long-term late effects from his earlier illness and treatment.  In fact, as discussed below, the evidence submitted by Defendant suggests that he does not suffer from any long term and late effects from the treatment he received.  (*See infra* Part III.C.)

5

### A.   *Section 3143(a)(2)*

As an initial matter, there is no dispute that Defendant's detention after his guilty plea was mandatory. Section 3143(a)(2) requires mandatory detention pending sentencing unless (1) "the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or" (2) "an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and" (3) "the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community." 18 U.S.C. § 3143(a)(2). Defendant has not sought to establish the first prong and I do not find a likelihood that a motion for acquittal or a new trial will be granted, and the Government is not recommending a sentence of no imprisonment, nor could it since the mandatory sentence required by statute is five years. With regard to the third prong, prior to filing the instant motion Defendant did not attempt to establish that he was not likely to flee or pose a danger to any person or the community; therefore, mandatory detention is appropriate.

"Accordingly, [Jones'] only hope for release is the 'escape hatch' found in Section 3145(c), which authorizes bail where a defendant (1) 'meets the conditions of release set forth in [S]ection 3143(a)(1),' meaning he establishes by clear and convincing evidence that he is not a flight risk or a danger to the community, and (2) 'if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.' 18 U.S.C. § 3145(c)." *United States v. Paulino*, No. 19 CR. 54 (PGG), 2020 WL 1847914, at \*5 (S.D.N.Y. Apr. 13, 2020); *see also United States v. Cubangbang*, No. (S1) 18 CR. 601 (PGG), 2020 WL 1905591, at \*4 (S.D.N.Y. Apr. 17, 2020).

6

### B.     *Section 3142(a)(1):  Risk of Flight and Danger to the Community*

Defendant argues that his temporary release to his mother "subject to conditions of strict home incarceration and electronic monitoring[,] [] would prevent any risk of flight or danger to the community during the COVID-19 crisis."  (Doc. 59, at 2.)  Defendant also argues that he is "indigent with very little resources but the love of his mother and family."[3]  (*Id*. at 10.)  The crux of Defendant's argument is that the moral suasion of his mother, strict home confinement, and electronic monitoring amount to a combination of conditions that are sufficient to assure his future appearance and the safety of the community.  In opposition the Government argues that Defendant is a danger to the community because:  (1) of the nature of the charge to which he pled guilty; (2) his alleged membership in the Carver Houses Crew; (3) his criminal history; (4) his commission of the instant offense while on parole; and (5) the circumstances of the COVID-19 pandemic will likely limit the ability of Pretrial Services "to effectively supervise the defendant if released[,] . . . as officers' ability to travel and visit with the defendant could be limited, and the resources of Pretrial Services are otherwise stretched."  (Doc. 60, at 5-6.)

Defendant does not discuss the underlying charge to which he pled guilty or the mandatory five-year sentence he faces as factors to be considered in making a determination of whether or not a finding can be made by clear and convincing evidence that he is not likely to flee or to pose a danger to any other person or to the community.  *See* 18 U.S.C. § 3143(a)(1).  In other words, Defendant does not substantively discuss the charge to which he pled guilty or the

---

[3] By asserting that he is indigent Defendant appears to be suggesting that he does not have the financial means to flee.  However, flight does not necessary have to include an expensive mode of transportation such as flying to a foreign country; failing to appear while hiding from law enforcement authorities is also considered flight.  *See Paulino*, 2020 WL 1847914, at *6 (prior issuance of bench warrant and evasion of police officers evidence of flight risk); *but see United States v. Esposito*, 749 F. App'x 20, 24 (2d Cir. 2018) (stating that defendant's "considerable wealth and apparent attempts to conceal it from Pre-Trial Services [were] significant reasons [] present[ing] a flight risk").

charges contained in the Superseding Indictment as it relates to whether he poses a danger to the community. The closest Defendant comes to making such an argument is his claim that he was "well on his way to rehabilitation" because he had two jobs at the time of his arrest. (Doc. 58, at 6-7.) However, no proof has been submitted to me to substantiate that Defendant was employed or other corroborative evidence to support the inference that his having legitimate employment is a sign of his rehabilitation. For the purpose of making this bail determination, I will accept the proffer that Defendant had two jobs prior to his arrest, but this fact is insufficient to outweigh Defendant's guilty plea, the allegations in the Superseding Indictment, Defendant's criminal record, and the fact that he committed the instant offense while on parole supervision. In other words, as detailed below, on this record I cannot find by clear and convincing evidence that Jones is not likely to flee or pose a danger to the safety of any other person or the community if released.

Defendant admitted during his plea allocution to participating in a five-year drug conspiracy during which he possessed an unlicensed firearm to protect his drugs and himself. (Doc. 45, at 19:6-10.) This charge carries a mandatory five-year sentence that must be served consecutively to any other term of imprisonment. Upon his plea of guilty Defendant was subject to mandatory detention, *see* 18 U.S.C. §§ 3143(a)(2), 3142(f)(1)(B), and there does not appear to be a dispute that Defendant committed the instant offence while he was on parole. These facts do not support a finding by clear and convincing evidence that Defendant is not a flight risk or does not pose a danger to the community, and militate against temporary release. *See Paulino*, 2020 WL 1847914, at *6 (finding a risk of flight and danger to the community based on defendant's commission of Hobbs Act robbery during probation, stipulated guidelines range of 84 to 105 months' imprisonment, prior issuance of bench warrant, and attempts to evade arrest).

8

The Government proffers in its opposition and alleges in the Superseding Indictment that Defendant was a member of the Carver Houses Crew and that from at least 2014 until approximately May 2019, the members of the Carver Houses Crew engaged "in, among other things, murder, attempted murder, assault with a dangerous weapon, and narcotics trafficking." (Sup. Ind. ¶ 1.)  In fact, the Superseding Indictment charged Defendant with the following crimes:  (1) participating in a Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy, (*id*. ¶¶ 1-9); (2) a 924(c) charge related to the RICO conspiracy, (*id*. ¶ 10); (3) attempted assault with a dangerous weapon in aid of racketeering and attempted murder in aid of racketeering, (*id*. ¶¶ 11-13); and (4) a 924(c) charge related to the attempted assault with a dangerous weapon and attempted murder, (*id*. ¶ 14).  The fact Defendant was employed at one job since July 2018 until his arrest and the other from October 2018 until his arrest does not sufficiently blunt the impact of the underlying charge or the charges contained in the Superseding Indictment.  I also note that Defendant's argument that his employment demonstrates he was on the path to rehabilitation is belied by the fact that Defendant is alleged to have committed attempted assault with a deadly weapon and attempted murder on August 26, 2018, after he had become employed at the first job.

Accordingly, based on the record before me, I cannot find by clear and convincing evidence that Defendant is not a flight risk or does not pose a danger to the community.  In any event, even if I could find by clear and convincing evidence that Defendant is not a flight risk and does not pose a danger to the community, as discussed below, Defendant has failed to establish exceptional reasons for his short-term release pending sentencing.

C.  *"Exceptional reasons": The Likelihood of Jones Contracting COVID-19 and MDC's Purported Failure to Contain COVID-19*

As the Government points out, the Federal Bureau of Prisons ("BOP") developed and has implemented a plan to mitigate the impact of COVID-19 on the federal prison population. In January 2020, the BOP began to plan specifically for COVID-19 to preserve the health and safety of inmates and BOP personnel. *See Federal Bureau of Prisons COVID-19 Action Plan*, Fed. Bureau of Prisons (updated Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp. The plan has thus far included five phases that have been implemented beginning in January 2020, including, among other things, the following:

- Phase 1: The establishment of a task force to develop strategic planning for COVID-19, including adding to already existing procedures for pandemics. *See Statement from BOP Director*, Fed. Bureau of Prisons (updated Mar. 26, 2020), https://www.bop.gov/resources/news/20200326_statement_from_director.jsp.
- Phase 2: The issuance of directives on March 13, 2020, suspending social and legal visits, limiting inmate movement, cancelling staff travel and training, limiting access for contractors and volunteers to facilities, and establishing enhanced screening for staff and inmates for locations with sustained community transmission and at all prison medical centers.[4] Facilities were also placed on modified operations to facilitate social distancing by, among other things, staggering meal times and recreation times. BOP also established quarantine and isolation procedures. *See Federal Bureau of Prisons COVID-19 Action Plan*, Fed. Bureau of Prisons (updated Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp.
- Phase 3: On March 18, 2020, the initiation of a plan for locations performing administrative services, following guidance from other Government agencies, to maximize teleworking. *See Bureau of Prisons Update on COVID-19*, U.S. Dep't of Justice (Mar. 24, 2020), *available at* https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.
- Phase 4: On March 26, 2020, the BOP implemented revised preventative

---

[4] For inmates these measures include the following: (1) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (2) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (3) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Federal Bureau of Prisons COVID-19 Action Plan*, Fed. Bureau of Prisons (updated Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp.

10

- measures for all institutions. The agency updated its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community trans[mission] area or not, be assessed using a screening tool and temperature check. This includes all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival. Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. *See COVID-19 Action Plan: Phase Five*, Fed. Bureau of Prisons (updated Mar. 31, 2020), https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.
- Phase 5: On April 1, 2020, BOP implemented the following actions to further mitigate the exposure and spread of COVID-19: (1) for a 14-day period, inmates would be secured in their assigned cells/quarters to decrease the spread of the virus; (2) coordination with the United States Marshals Service ("USMS") to decrease inmate movements during the 14-day time period; (3) during the 14-day time period, limited group gatherings will be permitted to the extent practical to facilitate commissary, laundry, showers, telephone, and computer access; (4) these modified operations will be re-evaluated after 14 days, and a decision made as to whether or not to return to modified operations. *See id.*

With regard to MDC's response to the COVID-19 pandemic, the Wardens of MDC and the Metropolitan Correctional Center ("MCC") wrote a joint letter dated March 18, 2020, to Chief Judge Colleen McMahon responding to her request for information concerning the "provision of medical care, procedures for social distancing and measures being taken to screen and isolate new arrivals, staff and the at risk population." *United States v. Nkanga*, No. 18-CR-713, 2020 WL 1529535, (S.D.N.Y. Mar. 31, 2020), ECF No. 77-2 at 1 ("Wardens' Letter"). The Wardens' Letter provided details with regard to, among other things, the medical screening of staff and new arrivals, how soap and cleaning supplies were being distributed, and what steps the institutions were taking with regard to inmates identified to be at risk. *Id*. at 2-3. The Wardens' Letter also described how the MCC had segregated most of the at risk inmates to one unit within the facility. The MDC, however, had not isolated its at risk population "because the number of inmates who fall into this category is too large to contain and isolate on one or even two units." *Id*. at 2. In a joint letter dated April 16, 2020, sent to Judge Roslynn R. Mauskopf—Chief Judge

11

of the U.S. District Court for the Eastern District of New York—the Wardens of MDC and MCC provided more recent information regarding their COVID-19 containment efforts. *See Letter to Judge Mauskopf, Adm. Order No. 2020-14*, Fed. Bureau of Prisons, Metropolitan Correctional Center (Apr. 16, 2020), available at https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200416_053113.pdf. The letter states that on April 13, 2020, the BOP ordered an extension of the April 1, 2020 action plan through May 18, 2020, and details further screening and hygiene efforts taken by these facilities. (*Id.*)

As of April 21, 2020, there are 25 confirmed cases at MDC (2 inmates and 23 staff), *COVID-19 Coronavirus*, Fed. Bureau of Prisons (last accessed Apr. 21, 2020), https://www.bop.gov/coronavirus/index.jsp, so it appears that the implementation of the actions detailed above have limited the spread of the virus within the institution; however, only time will tell how successful these efforts have been.[5] In any event, even with the transmission mitigation measures that have been put in place, the risk of contracting COVID-19 is higher in prison settings like the MDC because, among other things, the inmates live in close quarters and as a result inmates no doubt have more difficulty following social distancing. *See*, *e.g.*, *United States v. Nkanga*, No. 18-CR-713, 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020) ("Those detained in jails and prisons face particularly grave danger.") (collecting sources); *United States v. Little*, No. 20-CR-57, 2020 WL 1439979, at *2 (S.D.N.Y. Mar. 24, 2020) ("Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease."). Therefore, although I agree with the Government that Defendant's arguments in favor of temporary release due to COVID-19 rely on some speculation with regard to Jones' likelihood of

---

[5] Nationwide, as of April 21, 2020, 540 federal inmates and 323 BOP staff have confirmed positive test results for COVID-19, and 220 inmates and 49 staff have recovered. (*Id.*) There have been 23 federal inmate deaths and 0 BOP staff member deaths attributed to COVID-19 disease. (*Id.*)

12

contracting COVID-19, and the MDC's inability to contain COVID-19, it is clear to me that even with the transmission mitigation efforts being implemented that prisoners in the MDC do face a higher risk of contracting COVID-19 than people in the general public. *See United States v. McKenzie*, No. 18 CR. 834 (PAE), 2020 WL 1503669, at *3 (S.D.N.Y. Mar. 30, 2020) (stating "it is self-evident . . . that [defendant] is at greater risk of contracting COVID-19 while confined in the MCC than at home on release, *i.e.*, that he will be safer at home than in the MCC," but noting that "[t]he Government does not contend otherwise"). I find that Defendant's arguments therefore cannot be dismissed out of hand solely because they involve some speculation.

Defendant asserts that "exceptional reasons for Chaz Jones' short-term release pending sentencing are undeniably present," since "[t]he threat posed to the jail population, and in particular to Chaz Jones given his history of childhood leukemia with chemotherapy treatment, likely makes him more susceptible to COVID-19 and renders the hardships of continued detention unusually harsh." (Doc. 58, at 9.) The Government responds that "it is unclear whether the defendant is at any heightened risk as compared to other inmates at MDC," because Defendant "does not know whether he is still at risk given the fact that he has been in remission for the past nine years and has not undergone cancer treatment since 2010." (Doc. 59, at 5.)

The Defendant has not presented evidence that he is at an increased risk because he had Burkitt Lymphoma as a teenager, underwent treatment for that disease, and is currently in remission or has been cured. As noted above, in support of his assertion that his history of childhood leukemia and treatment make "him more susceptible to COVID-19," Defendant cites to various websites and studies that suggest individuals in his position might have "late effects" such as "reduced lung capacity" and "impairment of the immune function." (*Supra* n.2.) However, other than these general statements and citations, Defendant does not provide evidence

13

or even argue that he currently suffers from any long-term late effects from his earlier illness and treatment. Indeed, the evidence before me does not support a finding that Defendant suffers from long-term late effects from his illness and treatment.

      As an initial matter, individuals who have been successfully treated for Burkitt Lymphoma are not listed by the Centers for Disease Control and Prevention as being at increased risk for serious illness or death from COVID-19. *See Groups at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention (last accessed Apr. 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Although individuals who are "immunocompromised"[6] "might be at higher risk for severe illness from COVID-19," *id*., there is no evidence that Defendant is immunocompromised. In fact, the evidence suggests that Defendant is not immunocompromised. Attached to Defendant's reply submission is a letter from Mount Sinai Kravis Children's Hospital ("Children's Hosptial"). (Doc. 60-1.) The letter is from Kate Passero, Pediatric Nurse Practitioner, Division of Pediatric Hematology/Oncology. According to Pediatric Nurse Practitioner Passero, Defendant completed his treatment in January 2011 and was last seen by the Children's Hospital in February 2018, and at the time of his last visit "he was not neutropenic or immunocompromised, his ANC was

---

[6] "Many conditions and treatments can cause a person to have a weakened immune system (immunocompromised), including cancer treatment, bone marrow or organ transplantation, immune deficiencies, HIV with a low CD4 cell count or not on HIV treatment, and prolonged use of corticosteroids and other immune weakening medications." *Groups at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention (last accessed Apr. 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Although Defendant underwent cancer treatment approximately nine years ago, as demonstrated above there is no evidence that he is immunocompromised.

2800."[7] (*Id.*) "A healthy person has an ANC between 2,500 and 6,000."[8] *Understanding Your Lab Test Results*, American Cancer Society (last accessed Apr. 21, 2020), https://www.cancer.org/treatment/understanding-your-diagnosis/tests/understanding-your-lab-test-results.html. The letter went on to say that "[i]t is unclear if history of cancer is a risk factor for infection with COVID-19, but we ask that it be considered. This history, coupled with his incarceration may put him at increased risk of infection." (Doc. 60, Ex. A.) In other words, at the time Defendant was last seen at the Children's Hospital he did not have lower than normal white blood cell count, and his ANC was that of a healthy person. The request and statement that Defendant's history coupled with his incarceration might put him at increased risk of infection amount to speculation, and are belied by the specific testing and diagnoses contained in the letter. *See Cubangbang*, 2020 WL 1905591, at *6 (finding a lack of exceptional reasons where, despite defendant's alleged moderate asthma condition, defendant stated he was "in excellent physical health with no medical problems" and "never sought medical care" for his condition).

Accordingly, I find that clearly exceptional circumstances do not exist at this time to warrant Defendant's temporary release pursuant to Section 3145(c).

---

[7] Neutropenic means someone suffering from neutropenia. "Neutropenia is defined as a lower than normal number of neutrophils (a type of white blood cells). White blood cells are part of the immune system." *Low White Blood Cell Counts (Neutropenia)*, American Cancer Society (last accessed Apr. 21, 2020), https://www.cancer.org/treatment/treatments-and-side-effects/physical-side-effects/low-blood-counts/neutropenia.html. "ANC" refers to absolute neutrophil count. "The most important infection-fighting [white blood cell] is the neutrophil (NEW-truh-fil)." *Understanding Your Lab Test Results*, American Cancer Society (last accessed Apr. 21, 2020), https://www.cancer.org/treatment/understanding-your-diagnosis/tests/understanding-your-lab-test-results.html.

[8] Defendant initially stated that "[u]nder the urgent circumstances of the pandemic we are all experiencing, an opinion of a treating physician to aid the Court in this determination is unfortunately not available." (Doc. 58 at 6.)

## IV. **Conclusion**

Because Jones does not meet the conditions of release set forth in 18 U.S.C. § 3143(a)(2), and has not established the requirements for release under 18 U.S.C. § 3145(c)—that he is not a flight risk or a danger to the community, and has exceptional reasons for his release—his motion for temporary release is DENIED.

The Clerk's Office is directed to terminate docket entry 58.

SO ORDERED.

Dated: April 22, 2020
      New York, New York

Vernon S. Broderick
United States District Judge